UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF TENNESSEE
AT GREENEVILLE

| | | |
|---|---|---|
| LINDA LOLLAR, | ) | |
|     Plaintiff | ) | |
| | ) | |
| v | ) | NO: 2:04-CV-275 |
| | ) | |
| DTR TENNESSEE, INC., | ) | |
|     Defendant | ) | |

## MEMORANDUM OPINION AND ORDER
_____

The plaintiff filed her pro se complaint alleging race and sex discrimination pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. 2000e, *et seq.*, and age discrimination pursuant to the Age Discrimination in Employment Act of 1967, 29 U.S.C. § 621, *et seq.* This case is before the Court to address the defendant's motion for summary judgment. [Doc. 28]. The defendant has not filed a response.[1]

For purposes of this motion, the Court will adopt the defendant's undisputed proposed findings of fact:

**FINDINGS OF FACT**

1. Plaintiff, Linda Lollar (hereinafter referred to as "Lollar") is a female, date of birth May XX, 1957 (46 years of age at the time of her termination of

---

[1] Although no response to the defendant's motion has been filed with this Court, the defendant has filed a pleading entitled "Defendant's Reply to Plaintiff's Response to Proposed Findings of Fact as to Which There Is No Genuine Issue for Trial." [Doc. 35]

employment with DTR Tennessee, Inc.) and is African-American. Prior to becoming a DTR Tennessee, Inc. associate, Lollar had been employed with Holland Temporary Services. As a Holland employee, Lollar had been assigned to work at DTR Tennessee, Inc. on as many as three separate occasions.

2. During Lollar's first two temporary assignments to DTR Tennessee, Inc., she worked approximately one month on each occasion and does not recall the specific job she performed during those assignments.

3. Lollar's third temporary assignment to DTR Tennessee, Inc. began in February 2003. At that time, Lollar was employed in the welding department.

4. Lollar first reported to work as a DTR Tennessee, Inc. associate on June 2, 2003.

5. Lollar was not alleging that she was discriminated against in any way prior to June 2, 2003.

6. Prior to June 2, 2003, Lollar did not report any discrimination to her employer, Holland.

7. At the beginning of Lollar's employment with DTR Tennessee, Inc., she was provided an Associate Handbook and signed a receipt acknowledging that she had received the handbook.

8. DTR Tennessee, Inc. manufactures anti-vibratory shock-absorbing suspension components for the automobile industry.

9. Lollar was employed with DTR Tennessee, Inc. in the F-Zone, third shift.

10. Lollar preferred third shift and does not consider her assignment to third shift as discrimination.

11. F-Zone consisted of two types of machinery that associates operated to manufacture anti-vibratory parts. The two types of machinery were auto spray machines as well as STI molding machines. F-Zone contained approximately 15-20 STI machines.

12. According to the Curing Daily Report, Lollar first began operating the STI molding machines in the F-Zone on June 6, 2003.

13. DTR Tennessee, Inc. employed both male and female associates in the F-Zone.

14. Lollar was trained on how to operate the STI molding machines and how to complete the necessary paperwork called "Curing Daily Report" in the F-Zone.

15. Lollar received training on the STI molding machines in the F-Zone on and off for more than two weeks.

16. The curing mold machines molded rubber around metal parts.

17. Lollar's co-associates in the F-Zone department helped and trained her on the curing mold machines.

18. Lollar received training from various co-associates, male and female,

including Trina Green (white female), Andrea Stansell (white female) and Rudy Miller (white male). Lollar testified that other co-associates helped train her on the curing mold machines, but she cannot remember their names.

19. During Lollar's employment at DTR Tennessee, Inc., she was asked to work overtime to receive additional training on the curing mold machines.

20. Lollar testified that she is not claiming she was discriminated against by DTR Tennessee, Inc. on the basis of training on the STI molding machines or other equipment.

21. Lollar was an hourly employee and was not under an employment contract with DTR Tennessee, Inc.

22. Lollar testified that upon becoming a DTR Tennessee, Inc. associate, she received an Associate Handbook and that she understood that she could be terminated at any time for any reason within the law. Lollar also testified that she was not promised a job for any specific period of time, and as long as it was not for an illegal reason, she could be fired at any time.

23. Lollar testified that during her employment with DTR Tennessee, Inc., she was aware of the discrimination policy in the Associate Handbook; however, she never reported any discrimination or harassment to DTR Tennessee, Inc. during her employment.

24. Lollar testified that during the "first week and a few days" of her

employment with DTR Tennessee, Inc., she was treated fairly.

25. Lollar testified that during the first week of her employment as an associate with DTR Tennessee, Inc., she had a female supervisor, but could not remember her name. Her next supervisor was Rudy Miller (white male). Rudy Miller remained Lollar's supervisor in the F-Zone department during the remainder of her employment.

26. Lollar testified that Cal Doty, DTR Tennessee, Inc.'s Vice President of Human Resources never discriminated against her on any basis.

27. DTR Tennessee, Inc.'s F-Zone contained approximately 15-20 curing mold machines. The curing operators were both male and female associates. Each curing operator, including Lollar was assigned 3-4 curing machines.

28. Lollar testified that she was treated the same as other associates with respect to the number of curing mold machines she was assigned to in the F-Zone.

29. Lollar testified that her duties as a curing mold machine operator included operating the curing mold machines, making production, de-flashing, sorting rejects, emptying the box of rejects and housekeeping, including cleaning up around the production machines.

30. Lollar testified that she is not claiming she was discriminated against as a result of being assigned to work on the curing mold machines. Lollar testified that other curing operators performed the same duties that she was assigned.

31. After the parts were removed from the curing mold machine, the curing operator examined the parts to determine whether excess rubber was required to be de-flashed (trimmed) from the parts. Curing operators de-flashed parts while the mold machines were performing their molding cycles. The curing mold machines had different cycles, including five, six or seven minute cycles.

32. Lollar testified that she had gotten behind on de-flashing parts on occasion. Lollar was required to work overtime to continue operating her curing mold machines, and to de-flash parts.

33. As a mold machine operator, Lollar was responsible for completing a Curing Daily Report. The Curing Daily Report charts the number of cycles (shots) which are completed on a specific STI mold machine per shift. The Curing Daily Reports also reflect the identity of the associate operating a specific molding machine during each of the three shifts, and the number of cycles "shots" of each operator on the same specific machine ran each shift, and any comments the associate wanted to make regarding that specific mold machine's operations.

34. Lollar testified that part of her responsibilities as a mold machine operator was to complete the Daily Curing Report. Lollar testified that since she worked third shift, she was responsible for placing the date and machine number at the top of each report and that her production was documented in the top third of the documents designated by her associate number, 8299.

35. Curing Daily Report dated June 25, 2003 states that the associate that follows Lollar operating machine number F/571, running part number 14-002, ran 47 shots in comparison to charging party's 27 shots on the same machine. Also, the Curing Daily Report of that date shows documentation from the associate (number 7734) documented "this Mach. shut down at start of shift. 0 shots on counters had to take off full boxes and empty boxes. Assoc. [Lollar] is very lazey [sic] don't do her job . . ."

36. The June 25, 2003 Curing Daily Report, attached as Exhibit 13 to Lollar's deposition shows that the first shift operator completed 37 shots for the shift in comparison with Lollar's 27 shots on the same machine. (Lollar I, Exhibit 13).

37. Lollar testified that she could have left the box that was half full of parts for the next shift operator to take care of.

38. DTR Tennessee, Inc. requires all curing mold machine operators to accurately complete the Curing Daily Report. The Curing Daily Report assists DTR Tennessee, Inc. in tracing defective products and monitoring production.

39. Lollar testified that DTR Tennessee, Inc.'s Guidelines for Associate Conduct, which are found in the Associate Handbook, contains a rule for associate poor work performance.

40. Lollar testified that DTR Tennessee, Inc.'s Guidelines for Associate Conduct regarding poor work performance [No. 7] does not contain a requirement for

verbal, written or any kind of progressive counseling prior to termination of employment.

41. Lollar testified that her allegations in the Charge of Discrimination attached to her Complaint filed herein, states that the "company printed policy stated that the company would issue verbal warnings and then written warnings to its employees, none were issued to me prior to my discharge." Lollar testified that such allegation she was referring to page 16 of DTR Tennessee, Inc.'s Associate Handbook which is titled "C. Corrective disciplinary action." Lollar admitted that the corrective disciplinary action she was referring to was part of the DTR Tennessee, Inc. Attendance policy, and that the attendance policy did not relate to production or poor work performance.

42. Lollar testified that she was not terminated from her employment at DTR Tennessee, Inc. as result of attendance. Lollar testified that she was told that the basis of her termination was poor production.

43. Steve Rines was the production supervisor responsible for DTR Tennessee, Inc.'s F-Zone department in June 2003. Lollar's team leader Miller and the third shift team leader Green, worked with Lollar and gave her more opportunity to meet the curing job expectations as was given other Curing Operators. During June 2003, Steve Rines, along with team leader Miller and other DTR associates worked and met with Linda Lollar on several occasions to explain the Curing Operator job

expectations and help her improve her job performance. Despite DTR's efforts to help Lollar, her job performance did not improve as expected.

44. Rines, production supervisor, received several complaints regarding Lollar's poor job performance, including low quantity of production, poor quality of work, high levels of rejects and inability to properly complete paperwork from Lollar's team leader, Rudy Miller and the first shift team leader, Trina Green. Based upon Steve Rines' observations, Lollar's Curing Daily Reports and complaints of Lollar's job performance, it was his opinion that Lollar was either not qualified to perform the Curing Operator job, or she did not make the effort to meet the job expectations.

45. On June 18, 2003 Lollar was instructed that it was her turn to work overtime and that she was asked to work four hours overtime on first shift for team leader Trina Green. Lollar advised team leader Miller that she had to take her son to basketball camp. Team leader Miller instructed Lollar that she was required to work. Lollar refused to work the overtime on that occasion.

46. On June 25, 2003, Lollar met with team leader Miller, production supervisor Rines and first shift team leader Trina Green (female).

47. Lollar testified that the meeting she was called into and counseled by team leader Miller, production supervisor Rines and first shift team leader Green was regarding her work performance. During this June 25, 2003 meeting, Lollar was advised that her production was low and that she needed to improve her overall

performance as a curing operator.

48. Lollar testified that neither her team leader Miller nor Vice President of Human Resources, Doty, had never said anything inappropriate to her during her employment with DTR Tennessee, Inc.

49. The Curing Daily Reports production numbers show Lollar's third shift production and also show the first and second shift curing operator's production, while operating the exact same machines.

50. The Curing Daily Reports from June 6, 2003 through June 27, 2003 show that Lollar completed a total of 1,459 shots, the first shift curing operator completed 2,019 shots and the second shift operator completed 2,168 shots.

51. The Curing Daily Reports from June 6, 2003 through June 27, 2003 show that Lollar averaged 30.39 shots per shift while the first shift curing operator averaged 43.24 shots per shift and the second shift curing operator averaged 44.24 shots per shift.

52. On June 27, 2003, Lollar met with Doty, Vice President of Human Resources; Miller, team leader; and Steve Rines, production supervisor and was discharged because of low production. Due to Lollar not improving her poor job performance, Steve Rines recommended to Doty that Lollar's employment with DTR be terminated. During the June 27, 2003 meeting with Lollar, Doty advised her that due to her poor job performance including low production, she was discharged from

her employment with DTR. During the June 27, 2003 discharge meeting, Lollar's low production as reflected on the Curing Daily Reports was referenced. Lollar made no allegations of discrimination at the time of the discharge.

53. The decision to discharge Lollar on June 27, 2003, was made by Doty, Vice President of Human Resources, based upon the Curing Daily Reports showing Lollar's low production and job performance.

54. The first and second shift curing operators working on the same STI mold machines as Lollar, had significantly higher production than Lollar, based on the Curing Daily Reports from June 6, 2003 through June 27, 2003. The Curing Daily Reports from June 6, 2003 through June 27, 2003 show that Lollar's production was significantly lower than other Curing Operators working on the same machines on the first and second shifts. Lollar did not produce as many parts (shots) on her shift as other associates, regardless of age and whether white, female or male, or in comparison to Curing Operators working on other shifts.

55. During the June 27, 2003 discharge meeting, the Curing Daily Report was referred to and shown to Lollar and she was advised that her production was low.

56. In 2004, Lollar filed a Complaint alleging she was discharged from DTR Tennessee, Inc. because of her race, sex and age.

57. Lollar bases her allegations of discrimination on her contention that her date of hire was changed from May to June 2, 2003 "so they wouldn't have to pay

11

for holiday or birthday."

58. Lollar bases her discrimination claims on her contention that DTR Tennessee, Inc. took money out of her compensation for uniforms that she did not receive.

59. Lollar bases her race discrimination claim on the contention that she was the only black employee in the F-Zone and that "white employees working on shifts before and after [her] did not meet their production quotas either," and the white employees were not discharged.

60. Plaintiff further bases her race discrimination claim on the contention that "no white employee offered to help me during my employment with the company."

61. Lollar bases her race and sex discrimination claims on the contention that on one workday she produced 36 parts and an unidentified white male co-associate's production counter showed 35 parts, and she was discharged the last weekend in June and the white male was not.

62. Lollar bases her race, sex and age discrimination claims on the contention that she was producing approximately the same number of parts on her shift as white employee's on other shifts were producing, and she was discharged and replaced by a much younger white male.

63. Lollar bases her race and age discrimination on the assertion that the

white female employees on her shift were younger than her.

64. Lollar bases her race discrimination claim on the contention that a pile of parts that needed to be deburred (de-flashed) was always visible at her work station because her white co-workers never offered to help her.

65. Lollar bases her discrimination claims on the assertion that she was not paid for her birthday or holiday.

66. DTR Tennessee, Inc. did not have a policy or practice for paying associates compensation for their birthdays.

67. Lollar was never denied a uniform. Lollar cannot identify any specific associate hired during the first part of June 2003 that received a uniform on or before the date of her termination.

68. Lollar has no proof, witnesses or documentation to show that her discharge from DTR Tennessee, Inc. was due to anything other than her production being low.

69. Other than the curing operators listed on the Curing Daily Reports along with Lollar, she has never seen the Curing Daily Report production of other associates in the F-Zone on any shift.

70. Lollar has no evidence, witnesses or documentation to support her allegations that her production from June 6, 2003 through Jun 27, 2003 was as high as any other DTR Tennessee, Inc. curing operator.

13

71. Lollar was 46 years of age when she was hired and 46 years of age when she was discharged.

72. Lollar has no direct evidence that age, sex or race was a factor in DTR Tennessee, Inc.'s decision to discharge her.

73. Lollar was not replaced by a younger white male.

74. Rudy Miller, nor any DTR Tennessee, Inc. management associate ever told another associate not to help or assist Lollar in the performance of her duties as a curing operator.

75. When Lollar needed help at work, she could ask for help from team leader Miller and he would send someone to help her.

76. The much younger white male that Lollar contends replaced her, was working in the F-Zone department while Lollar was employed.

77. Lollar has no evidence or knowledge that a younger white male replaced her as a curing operator in F-Zone.

78. Lollar's age was never discussed with team leaders Green, Miller, production supervisor Rines or Vice President of Human Resources, Doty, and was not an issue with respect to her employment.

79. Lollar testified that she cannot identify any DTR Tennessee, Inc. associate who was treated better than her with respect to insurance benefits, direct deposit, uniforms or any other aspect of the hiring process.

## **CONCLUSIONS OF LAW**

In regard to the plaintiff's Title VII race and sex discrimination claims, her burden of proof is explained in *Talley v. Bravo Pitino Restaurant, Ltd.*, 61 F.3d 1241, 1246 (6th Cir. 1995):

> In Title VII actions, the plaintiff bears the initial burden of establishing prima facie case of discrimination by the defendant. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1973). A plaintiff may establish a prima facie case of discrimination either by presenting direct evidence of intentional discrimination by the defendant, *Terbovitz v. Fiscal Court*, 825 F.2d 111, 114-15 (6th Cir.1987) (citing *Trans World Airlines, Inc. v. Thurston*, 469 U.S. 111, 121, 105 S.Ct. 613, 621-22, 83 L.Ed.2d 523 (1985)), or by showing the existence of circumstantial evidence which creates an inference of discrimination, *McDonnell Douglas*, 411 U.S. at 802, 93 S.Ct. at 1824. Under the latter approach, the plaintiff must show (1) that he is a member of a protected group, (2) that he was subject to an adverse employment decision, (3) that he was qualified for the position, and (4) that he was replaced by a person outside of the protected class. *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 582 (6th Cir.1992); see also *McDonnell Douglas*, 411 U.S. at 802, 93 S.Ct. at 1824; *Chappell v. GTE Prods. Corp.*, 803 F.2d 261, 265 (6th Cir.1986), cert. denied, 480 U.S. 919, 107 S.Ct. 1375, 94 L.Ed.2d 690 (1987).

In her complaint and the attached Charge of Discrimination, the plaintiff arguably has alleged sufficient circumstantial evidence that would establish her prima facie case: (1) She is a member of protected groups based upon her race, her age, and her sex, (2) that she was subject to an adverse employment decision, i.e. she was

terminated (3) that she was qualified for the position, and (4) that she was replaced by a person outside of the protected class, i.e., a younger white male employee.

Assuming that the plaintiff has established a prima facie claim, the burden shifts to the defendant to proffer a legitimate, non-discriminatory reason for the employment decision. *White v. Columbus Metropolitan Housing Authority*, 429 F.3d 232, 238 (6th Cir. 2005). *Seay v. Tenn. Valley Auth.*, 339 F.3d 454, 463 (6th Cir.2003). The defendant has met this burden by evidence that the plaintiff was discharged because of poor job performance. Therefore, the plaintiff must establish that the defendant's stated reason was mere pretext for its true discriminatory motives. *Id.*

This McDonnell Douglas burden-shifting framework for circumstantial-evidence cases also applies to claims brought under the Age Discrimination in Employment Act. *Grosjean v. First Energy Corp.*, 349 F.3d 332, 335 (6th Cir.2003). Therefore, the plaintiff's burden of proof in regard to her age discrimination claim is the same as for her race and sex discrimination claims.

The Court FINDS that the defendant has offered undisputed evidence that the plaintiff was terminated due to legitimate, non-discriminatory business reasons, and the plaintiff has failed to establish that the defendant's stated reason is mere pretext for its true discriminatory motives. Therefore, her claims of race, sex, and age discrimination must fail. Accordingly, it is hereby **ORDERED** that the defendant's motion for summary judgment is **GRANTED**, [Doc. 28], and the plaintiff's complaint

is **DISMISSED**.

**ENTER:**

s/J. RONNIE GREER
UNITED STATES DISTRICT JUDGE